IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 14, 2024 Session

## ERIKA JEAN SCHANZENBACH v. DENISE SKEEN

Appeal from the Chancery Court for Sullivan (Bristol) County
No.    20-CB-27096        William K. Rogers, Chancellor

_____

### No. E2023-00459-COA-R3-CV
_____

This appeal concerns the trial court's denial of a petition for an order of protection based upon allegations of stalking. This is one of four cases in which the petitioner sought an order of protection against four women. We affirm the trial court's denial of the petition in this case.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., joined. THOMAS R. FRIERSON, II, J., filed a separate opinion concurring in part and dissenting in part.

W. Andrew Fox, Knoxville, Tennessee, and Martin A. Cannon (pro hac vice) and Michael G. McHale (pro hac vice), Omaha, Nebraska, for the appellant, Erika Jean Schanzenbach.

Alexis Irene Tahinci, Kingsport, Tennessee; Devon Chase Muse, Johnson City, Tennessee; and Laura Hecht-Felella (pro hac vice), Brooklyn, New York, for the appellee, Denise Skeen.

## OPINION

## I. BACKGROUND

Erika Jean Schanzenbach ("Petitioner") has frequented the Bristol Regional Women's Center ("the Clinic") for years as a pro-life advocate, commonly referred to as a sidewalk counselor. She holds signs, attempts to speak with women entering the Clinic, and speaks through a "small amplifier" to share her beliefs. Petitioner, who is employed elsewhere, stands outside the Clinic on the roadside on a weekly basis.

Denise Skeen ("Denise[1]"), along with Cheryl Hanzlik, Alethea Skeen, and Rowan Skeen (collectively "Respondents"), also frequent the Clinic. Their purported purpose is to counter Petitioner's efforts and offer support for those entering the Clinic.

Petitioner and Respondents had several encounters in late 2019 and in January 2020 that led Petitioner to file petitions for orders of protection that would prohibit Respondents from contacting her, coming close to her, causing intentional damage to her property, and interfering with her efforts to assist women at the Clinic. As pertinent to this appeal, Petitioner alleged as follows:

On April 8, [2020], Denise confronted me as her daughter Alethea harassed me (as described in my amended petition against Alethea Skeen) on the west side of Slaughter Street on the public right-of-way. She told me I could not be within 6 feet of [the Clinic's] property line, as inaccurately demarcated by her, and told me to "Get away bitch," and pointed at me to go back to the other side of the street. She then followed me when I tried to walk to the other end of the facility's driveway along the west side of Slaughter Street. When I told her to stop following me, she told me to stop harassing patients, thus implicitly acknowledging she was following me. She only stopped when I walked back to the east side of Slaughter Street.

On December 23, 2019, Denise followed directly behind and against me as I gathered my pro-life group standing on W. State Street and walked eastward across Slaughter Street. Denise walked directly into me as I reached the street crossing despite my request that she get away from me.

On November 20, 2019, Denise approached me and shouted repeated noises through a bullhorn pointed directly in my face as I stood on the east side of Slaughter Street and attempted to use a small hand-held amplification device to communicate to patients in the [C]linic parking lot. I have only used the amplification device since being drowned out by a bullhorn in my face, shouting, or loud amplified noise from speakers deployed by the [C]linic's escorts. Denise followed me and continued shouting through her bullhorn directly in my face even when I tried to move away from her. She also held a sign up in front of my device in a further effort to cut off my communication.

On September 18, 2019, Denise confronted me on W. State Street and stood directly in my face outside of the abortion facility despite my requests for her to back off. She held a sign in my face and prevented me from

[1] We will refer to Respondent Denise by her first name throughout the opinion solely for the purpose of clarity given the involvement of her family members in the other actions.

communicating with patients in the [C]linic parking lot. She followed me up and down the sidewalk as I tried to move away from her. She also stepped on my feet. This stalking behavior specifically targeting me went on nearly non-stop for two hours straight.

On September 4, 2019, Denise followed me from the west to the east side of Slaughter Street, where she encroached into my personal space and repeatedly touched me and my sign despite my requests that she not touch me. Denise intimidated me by saying she "[doesn't] want [me] at this clinic, so go away." She was soon joined by her daughter Alethea, who joined her mother in crowding against me while holding her large, open rainbow umbrella. Denise then started acting very sexual, asking me in a suggestive tone, "Daddy still [expletive] you?" She also made lots of sexual tongue gestures in furtherance of her stated intent to demonstrate oral sex techniques.

On June 19, 2019, Denise deliberately kicked my sign into the street. Then Denise, along with her daughter Alethea and husband James, approached and confronted my group on the east side of Slaughter Street and shouted in our ears repeatedly over a span of multiple minutes as we attempted to pray. In general, Denise also routinely engages in lewd behavior directed at me, including repeatedly touching herself in sexual wavs (e.g, grabbing her own breasts, rubbing her thighs and vagina outside her clothing, making thrusting movements with her hips, dances, etc.) while looking directly at me and smiling. She also confronts me with extremely sexual comments while I stand on the public right of way, including: (a) repeated accusations of me committing incest with my father; (b) descriptions of oral sex acts; (c) descriptions of sodomy; and (d) descriptions of masturbation. She also accuses me of getting sexual enjoyment out of her daughters, Alethea and Rowan, pressing themselves up against me. She makes sexually suggestive and/or derogatory comments about my body and how I dress, etc.

Denise's conduct is entirely illegitimate and prevents my legitimate and legal efforts at counseling women in need. Inasmuch as my counseling will continue, Denise's conduct will continue.

These incidents have caused me significant mental suffering and distress, and have caused me to feel terrorized, frightened, intimidated, threatened, harassed, and molested. These incidents would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

In sum, Petitioner alleged that over the course of several days in June, September, November, and December 2019 and again in April 2020, Denise harassed her by shouting

- 3 -

at her through a bullhorn, following her along the sidewalk, standing directly in her face, stepping on her feet, repeatedly touching her and her signage, telling her to go away, issuing verbal insults that were sexual in nature, kicking her sign into the street, and shouting while she attempted to pray.

The trial court did not issue temporary ex parte orders of protection and denied Petitioner's request to consolidate the four cases. The court consolidated the hearings in the interest of judicial economy but maintained each petition as a separate action.

The consolidated hearing occurred on August 4, 2020, at which time Petitioner submitted lengthy video evidence of her interactions with Respondents for the court's consideration. As to Denise, Petitioner alleged that Denise engaged in several instances of stalking from June 2019 through April 2020. Petitioner claimed that Denise made sexually suggestive comments and gestures toward her, kicked her sign, yelled into her face, invaded her personal space, followed her, and repeatedly stepped on her feet throughout the pertinent time period. Denise continued in her behavior, despite Petitioner's requests for her to stop. These events precipitated a final interaction in which Denise pushed her umbrella into Petitioner's head, prompting police intervention and a citation for assault on May 27, 2020. The trial court considered this last incident as alleged evidence of Petitioner's continued need for an order of protection. As to each Respondent, Petitioner testified that she felt anxious prior to her self-designated day at the Clinic and that she felt exhausted and, at times, "violated" following her encounters with them. She claimed she had difficulty working on the days she spent time at the Clinic. She agreed that she was able to sleep upon her return home after a glass of wine to settle her anxiety.

Respondents did not submit evidence for the court's consideration.

The trial court denied the petition for the order of protection, stating that Petitioner failed to establish her allegations of stalking within the meaning of Tennessee Code Annotated section 39-17-315(a)(4).[2] The trial court dismissed the action without prejudice, utilizing a form order that did not contain findings of fact and conclusions of law in support of the decision. Upon appeal to this court, we vacated the ruling and remanded for the issuance of sufficient findings of fact and conclusions of law. *Schanzenbach v. Skeen*, No. E2020-01198-COA-R3-CV, 2022 WL 3696896 (Tenn. Ct. App. Aug. 26, 2022).

During the pendency of the appeal, the United States Supreme Court issued its ruling in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), in which it held that the federal constitution does not provide a right to abortion. The Clinic at issue

---

[2] "'Stalking' means a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested[.]"

here was closed. A similar clinic opened nearby in Virginia.

Upon remand, Petitioner requested a new hearing to update the record due to the passage of time, the Court's ruling in *Dobbs*, and related changes in Tennessee. Respondents opposed Petitioner's request. The court denied further hearing and entered a new order with findings of fact and conclusions of law in support of its original dismissal of the petition. The court found that there was no medical proof of emotional distress and that the videotaped evidence did not support a claim of significant mental distress. The court explained that Petitioner was seen putting her hands on others and that her continued interactions did not reflect someone who had been terrorized, frightened, intimidated, threatened, harassed, or molested. The court further noted that the police were often present in the videos, along with many other people. The court provided that Petitioner voluntarily continued to appear at the Clinic and that the presence of both parties at the Clinic served a legitimate purpose. This second appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal as follows:

A.      Whether sufficient evidence was presented to establish Petitioner's allegations of stalking in the form of harassment at the Clinic.

B.      Whether this action is now moot as a result of the Clinic's closure.

C.      Whether this appeal is frivolous.

## III. STANDARD OF REVIEW

The trial court may issue an order of protection if "the petitioner has proven the allegation of domestic abuse, stalking or sexual assault by a preponderance of the evidence." Tenn. Code Ann. § 36-3-605(b). "Proving an allegation by a preponderance of the evidence requires a litigant to convince the trier-of-fact that the allegation is more likely true than not true." *McEwen v. Tenn. Dep't of Safety*, 173 S.W.3d 815, 825 n.19 (Tenn. Ct. App. 2005) (citing *Austin v. City of Memphis*, 684 S.W.2d 624, 634–35 (Tenn. Ct. App. 1984)).

We review this non-jury case de novo upon the record, with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). This presumption of correctness applies only to findings of fact and not to conclusions of law. *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996). The trial court's conclusions of law are subject to a de novo review with no

presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011).

To the extent that this case requires that we construe statutes, our review is also de novo. *Freeman v. Marco Transp. Co.*, 27 S.W.3d 909, 911–12 (Tenn. 2000) ("Issues of statutory construction are questions of law and shall be reviewed de novo without a presumption of correctness."). In construing statutes, we keep the following guidance in mind:

> Our resolution of this issue is guided by the familiar rules of statutory construction. Our role is to determine legislative intent and to effectuate legislative purpose. The text of the statute is of primary importance, and the words must be given their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose. When the language of the statute is clear and unambiguous, courts look no farther to ascertain its meaning. When necessary to resolve a statutory ambiguity or conflict, courts may consider matters beyond the statutory text, including public policy, historical facts relevant to the enactment of the statute and the entire statutory scheme. However, these non-codified external sources "cannot provide a basis for departing from clear codified statutory provisions."

*Dallas v. Shelby Cnty. BOE*, 603 S.W.3d 32, 37 (Tenn. Ct. App. 2019) (quoting *Mills v. Fulmarque, Inc.*, 360 S.W.3d 362, 368 (Tenn. 2012) (citations omitted)).

## IV. DISCUSSION

### A.

Petitioner claims that the trial court's denial of relief for Denise's behavior at the Clinic was error when the statute provides that any victim of stalking can obtain relief. Petitioner cites the history of the legislative provisions in support of her claim, noting that the pertinent statutes were expanded beyond the bounds of domestic disputes to include victims of stalking, who may or may not have any prior relationship with the perpetrator.

Orders of protection are statutorily governed by Tennessee Code Annotated section 36-3-601, et seq. Prior to 2005, orders of protection were available only to those in domestic relationships, whether related by marriage or otherwise involved in a relationship with the perpetrator. The stated purpose of the statutes was

to recognize the seriousness of domestic abuse as a crime and to assure that the law provides a victim of domestic abuse with enhanced protection from domestic abuse. A further purpose of this chapter is to recognize that in the past law enforcement agencies have treated domestic abuse crimes differently than crimes resulting in the same harm but occurring between strangers. Thus, the General Assembly intends that the official response to domestic abuse shall stress enforcing the laws to protect the victim and prevent further harm to the victim and the official response shall communicate the attitude that violent behavior is not excused or tolerated.

Tenn. Code Ann. § 36-3-618. In 2005, the General Assembly amended the statutes to also protect victims of sexual assault and stalking, regardless of the relationship between the victim and perpetrator. 2005 Tennessee Laws Pub. Ch. 381 (S.B. 645). However, the legislative purpose and intent of the statutes remained, despite numerous updates to the statutes and the inclusion of sexual assault and stalking victims. *See generally* Tenn. Code Ann. § 36-3-618 (reflecting no substantive changes since 1995).

Pursuant to Section 36-3-602(a), a stalking victim may seek relief from the courts pursuant to Title 36 when such person "has been subjected to, threatened with, or placed in fear of, domestic abuse, stalking, or sexual assault." "'Stalking victim' means any person, regardless of the relationship with the perpetrator, who has been subjected to, threatened with, or placed in fear of the offense of stalking, as defined in [section] 39-17-315." Tenn. Code Ann. § 36-3-601(11). Section 39-17-315(a)(4) defines stalking as

a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

Similarly,

"Harassment" means conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable person to suffer emotional distress, and that actually causes the victim to suffer emotional distress. Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose[.]

Tenn. Code Ann. 39-17-315(a)(3). Emotional distress is defined as "significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling." Lastly,

(5) "Unconsented contact" means any contact with another person that is initiated or continued without that person's consent, or in disregard of that person's expressed desire that the contact be avoided or discontinued. Unconsented contact includes, but is not limited to, any of the following:

(A)     Following or appearing within the sight of that person;

(B)     Approaching or confronting that person in a public place or on private property;

(C)     Appearing at that person's workplace or residence;

(D)     Entering onto or remaining on property owned, leased, or occupied by that person;

(E)     Contacting that person by telephone;

(F)     Sending to that person mail or any electronic communications, including, but not limited to, electronic mail, text messages, or any other type of electronic message sent using the internet, websites, or a social media platform; or

(G)     Placing an object on, or delivering an object to, property owned, leased, or occupied by that person[.]

Citing *PLT v. JBP*, No. 346948, 2019 WL 7206134 (Mich. Ct. App. Dec. 26, 2019), Petitioner claims that she was entitled to an order of protection under the circumstances presented here. In *PLT*, the appellate court in Michigan upheld a trial court's grant of an order of protection against a pro-life advocate for his behavior toward an abortion clinic's employee. 2019 WL 7206134, at *7. The respondent argued that his protests were constitutionally protected conduct serving a legitimate purpose, which cannot constitute harassment within the meaning of the Michigan statutes. *Id.* at *3. In determining whether to uphold the order, the court in *PLT* noted that an individual's right to free speech must be considered alongside the right for others "to be let alone." *Id.* at *3–4 (citing *Hill v. Colorado*, 530 U.S. 703, 716–17 (2000)). Acknowledging that while "[p]ublic protests regarding abortion, whether in support or opposition, serve legitimate political purposes," the court held that respondent's actions "exceeded the permissible scope of the activity" and violated the petitioner's right to be let alone. *Id.* at *4. The court noted that the respondent went beyond his political message and targeted the petitioner, directing his comments toward her when other workers were present. *Id.* The court continued,

Respondent's conduct violated petitioner's right to be let alone. Petitioner repeatedly told respondent that he was scaring her and to get away from her.

Respondent ignored these requests. Accordingly, respondent was aware that his conduct was having a negative impact on petitioner. Despite this knowledge, respondent continued to approach petitioner. Consequently, the trial court could reasonably find, as it did, that respondent was no longer simply seeking to share his political viewpoint with someone who might be receptive to his beliefs. Instead, respondent was antagonizing an individual who knew his views, did not share them, did not wish to hear them, and had repeatedly asked him to stop because he was scaring her. Such conduct was no longer constitutionally protected because respondent violated petitioner's right to be let alone when he repeatedly attempted to press his ideas on an unwilling participant. Respondent's conduct no longer served a legitimate purpose because it exceeded the scope of his general anti-abortion protest, having moved from advocacy to threatening conduct. Accordingly, respondent's behavior instead became that of an individual continually accosting someone who repeatedly asked him to stop and told him that he was scaring her. Thus, because respondent's conduct did not serve a legitimate purpose, it was not constitutionally protected.

*Id.*

Here, Petitioner argues that the reverse scenario was present in this case, namely Denise's conduct moved from legitimate advocacy protected by her right to free speech to threatening conduct, despite Petitioner's repeated requests to leave her alone. Denise responds that the court's opinion in *PLT* is neither binding nor applicable. She distinguishes her behavior by claiming that there was no evidence of assault presented but that there were moments caught on video where she confirmed that she was not touching Petitioner. She claims that her use of foul language and positioning next to Petitioner was simply not enough to sustain the petition.

We must first note that the parties' treatment of clinic patients is not at issue in this case. Further, unlike the facts presented in *PLT*, neither party is employed by the Clinic. The matter before this court concerns the behavior between protestors from opposing sides that also involves a balancing act between the right to free speech and the right to be let alone as presented in *PLT*. The parties each appear at the Clinic voluntarily and with an entourage. They engage frequently enough to know each other on a first name basis. Petitioner defends herself, shares her opinion of the competing side openly and freely, and returns week after week.[3] In return, Respondents attempt to prevent Petitioner from interacting with patients at the Clinic. At times, the police are also present and operate to separate the two opposing groups. Interactions between Petitioner and the Respondents are limited to the issue of their opposing viewpoints on abortion.

---

[3]We acknowledge that Petitioner ceased her protesting activities for approximately two months following an alleged incident of assault on May 27, 2020, but she has since returned.

Additionally, the trial court found that there was no medical proof of emotional distress and that the videotaped evidence did not support a claim of significant mental distress. The court explained that Petitioner was seen putting her hands on others and that her continued interactions did not reflect someone who had been terrorized, frightened, intimidated, threatened, harassed, or molested. The record confirms that Petitioner was able to calm herself from her time at the Clinic with a glass of wine before bed. We agree with the trial court's assessment that Petitioner established no proof of emotional distress to support her claims. The court further noted that the police were often present in the videos, along with many other people. The court provided that Petitioner voluntarily continued to appear at the Clinic and that the presence of both parties at the Clinic served a legitimate purpose. The evidence does not preponderate against the trial court's findings. In consideration of the foregoing, we affirm the trial court's denial of the petition as it related to the claims of stalking in the form of harassment at the Clinic.

B.

We acknowledge that time has marched on since the filing of our initial decision in which we remanded this matter to the trial court. Accordingly, in the event of further appellate review, we will address Denise's assertion that this action is now moot because the Clinic no longer exists. Denise further explains that the parties have not interacted for some time as a result of the closure of the Clinic. Petitioner acknowledges the closure of the Clinic identified in her petitions but submits that an order of protection entered in Tennessee would operate to bar further stalking in the form of harassment from Respondents at the new clinic located in Virginia. She further asserts that any voluntary cessation of illegal activity cannot support a finding a mootness when the Respondents will be free to resume the same conduct once the action has been dismissed as moot.

Courts limit their role to deciding "'legal controversies.'" *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam County*, 301 S.W.3d 196, 203 (Tenn. 2009) (quoting *White v. Kelton*, 232 S.W. 668, 670 (Tenn. 1921)). A proceeding is deemed a legal controversy "when the disputed issue is real and existing, and not theoretical or abstract, and when the dispute is between parties with real and adverse interests." *Id.* (citations omitted). "A moot case is one that has lost its justiciability either by court decision, acts of the parties, or some other reason occurring after commencement of the case." *Id.* at 204. "[W]hen the question of mootness is raised, [courts] consider many factors, including the reason that the case is alleged to be moot, the stage of the proceeding, the importance of the issue to the public, and the probability that the issue will recur." *Id.*

Petitioner is correct in her assertion that a protection order issued in this state would be afforded full faith and credit in Virginia.[4] However, issuing such an order at this stage

---

[4] "Any protection order issued . . . by the court of one State [] shall be accorded full faith and credit

of the proceedings would operate as an advisory or theoretical opinion when the disputed issue between the parties is no longer real and existing in this state. Accordingly, we alternatively hold that this action has been rendered moot by the closure of the Clinic.

C.

Denise asserts that this new appeal is frivolous and lacking of justiciable issues, thereby entitling her to attorney's fees on appeal. Tennessee Code Annotated section 27-1-122, provides that:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

Tenn. Code Ann. § 27-1-122.

The decision whether to award damages for a frivolous appeal rests solely in our discretion. *Chiozza v. Chiozza*, 315 S.W.3d 482, 493 (Tenn. Ct. App. 2009). Appellate courts exercise their discretion to award fees under this statute "'sparingly so as not to discourage legitimate appeals.'" *Eberbach v. Eberbach*, 535 S.W.3d 467, 475 (Tenn. 2017) (quoting *Whalum v. Marshall*, 224 S.W.3d 169, 181 (Tenn. Ct. App. 2006)). "'Successful litigants should not have to bear the expense and vexation of groundless appeals.'" *Whalum*, 224 S.W.3d at 181 (quoting *Davis v. Gulf Ins. Grp.*, 546 S.W.2d 583, 586 (Tenn. 1977)). "A frivolous appeal is one that is 'devoid of merit,' or one in which there is little prospect that it can ever succeed." *Indus. Dev. Bd. v. Hancock*, 901 S.W.2d 382, 385 (Tenn. Ct. App. 1995). Exercising our discretion in such matters, we respectfully deny Denise's request for fees on appeal.

## V. CONCLUSION

For the reasons stated above, we affirm the decision of the trial court. The case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Erika Jean Schanzenbach.

_____
JOHN W. MCCLARTY, JUDGE

---

by the court of another State [] and enforced by the court and law enforcement personnel of the other State [] as if it were the order of the enforcing State[.]" 18 U.S.C. § 2265.